UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

MAR 07 2006

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ERIC CASTANEIRA, | \* | CIV 03-4167 |
| Plaintiff, | \* | |
| -vs- | \* | MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT |
| ED LIGTENBERG, Executive Director, South Dakota State Board of Pardons and Paroles, | \* | |
| Defendant, | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is Defendant Ed Ligtenberg's motion for summary judgment. (Doc. 26.) For the following reasons, the motion will be granted as to Plaintiff's claim for damages.

## BACKGROUND

Plaintiff, Eric Castaneira, brought this pro se action pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated when Ed Ligtenberg ("Ligtenberg") and members of the South Dakota Board of Pardons and Paroles imposed certain conditions on his parole and suspended-sentence release. Plaintiff also contends that actions taken by Ligtenberg during the course of the proceedings were retaliatory. Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c), and the motion was granted as to all claims and all parties with the exception of the retaliation claim asserted against Ligtenberg. (Doc. 17.) That Memorandum Opinion and Order addressed the doctrine of absolute quasi-judicial immunity and its applicability to the defendants in this case. The Parole Board members were accorded absolute immunity. Based on the record at that time, the Court was unable to determine whether Ligtenberg was entitled to absolute immunity

because his function in this matter was not clear. Ligtenberg now has filed the pending motion for summary judgment, asserting absolute quasi-judicial immunity and, alternatively, qualified immunity.

Ligtenberg submitted a statement of undisputed material facts in support of his motion for summary judgment, doc. 28, as required by Local Rule 56.1(B). Plaintiff responded and submitted his own statement of facts. Very few objections were made to the facts stated by Ligtenberg, and the Court will recite those undisputed facts below, taking into consideration Plaintiff's objections. That said, the facts viewed in the light most favorable to Plaintiff are: On or about February 11, 1992, Castaneira pled guilty to kidnaping in violation of SDCL § 22-19-1. Castaneira was sentenced to one hundred years in prison, with thirty years of this sentence suspended on the following terms and conditions: (i) that he not be within 300 yards of any Midland National Life Insurance Company (Midland Insurance) for life; (ii) that he have no contact with present or former employees of Midland Insurance for life; and (iii) that he follow any parole board recommendations as to psychiatric counseling. Castaneira appealed his sentence, which was upheld by the South Dakota Supreme Court. On December 11, 1998, Governor William Janklow entered an order commuting Castaneira's sentence to a term of fifty years, with thirty years suspended.

Castaneira's challenges to the Parole Board's authority to impose conditions on his release began as early as 2000. On or about August 21, 2000, Castaneira wrote to the Parole Board asking whether the conditions imposed by the sentencing court would be applied to his suspended sentence if he were ever granted release. At the time Castaneira wrote this letter, Kris Peterson (Peterson) was Executive Director of the Parole Board. Peterson responded to Castaneira in a letter dated September 1, 2000. Castaneira was told that the conditions of his suspended sentence would include those that had been imposed by the sentencing court, including the no-contact provisions. Attached to Peterson's September 1, 2000, letter was a copy of the standard form used for supervision agreements. Peterson also told Castaneira that if he refused to sign the parole agreement, he would be required to appear before the Parole Board and his release could be revoked.

2

On February 2, 2001, Castaneira filed a lawsuit in United States District Court for the District of South Dakota against Peterson and several individual Parole Board members seeking a declaration that, based upon the commutation order, the Parole Board lacked the authority to impose any conditions on his release. Castaneira also requested an injunction prohibiting the Parole Board from imposing conditions on his release. Castaneira alleged in his complaint in the 2001 federal action that the Parole Board had "indicated that the conditions set forth in the South Dakota Department of Corrections/South Dakota Board of Pardons and Paroles Standard Parole Agreement would contain the conditions regarding the supervision of the Plaintiff during the suspended sentence portion of his sentence, as well as the potential of additional conditions being set." Castaneira argued that based on the commutation order, neither the Department of Corrections (DOC) nor the Parole Board had the legal authority to impose conditions on his release. He claimed that if he refused to sign the release agreement on the offered terms, the Parole Board would deny his requests for release and might even revoke his suspended sentence. In his prayer for relief, Castaneira asked the Court to "prohibit [the Parole Board] from imposing any conditions on [his] suspended sentence other than those specifically set forth by the Commutation Order of Governor Janklow or by statute..." and to "...order the Board of Pardons and Paroles to include only those conditions on the suspended portion of [his] sentence" that had been set forth in the commutation order. Castaneira made no reference in his 2001 federal action to any lawsuits or claims against Midland Insurance, nor did Castaneira allege that the no-contact provisions would interfere with his access to the courts.

In late February, 2001, shortly after Castaneira filed his 2001 federal lawsuit challenging the Parole Board's authority to impose conditions on his release, Defendant Ed Ligtenberg (Ligtenberg) was appointed Executive Director (Director) of the Parole Board. The materials filed with the Court in *Castaneira v. Jorgenson, et al.,* 01-CV-4026-JES, (filed February 2, 2001 (Doc. No. 1)) reflect that prior to Ligtenberg assuming the position of Director, Castaneira had been told by Peterson that his supervision agreement would include the terms and conditions set by the sentencing court and, if he were ever presented with a supervision agreement, that the agreement must be signed as offered. Ligtenberg's actions with respect to Castaneira were consistent with what Peterson had told Castaneira in 2000.

3

On May 15, 2002, the court entered its Memorandum Opinion and Order in *Castaneira v. Jorgenson, et al.*, 01-CV-4026-JES (see Doc. No. 74) dismissing Castaneira's claims without prejudice. Although the Court determined that Castaneira's claims were not ripe for adjudication, it noted that it "would be inclined to find it is within the power of the Board of Pardons and Paroles to impose conditions on Mr. Castaneira's suspended sentence..." The Court also explained that any challenge Castaneira might bring to the terms and conditions of his release must be brought through a habeas action.

Ligtenberg is currently employed by the DOC as Director of the Parole Board. Prior to being named Director, Ligtenberg had no involvement in Parole Board matters. As Director, Ligtenberg is familiar with the facts surrounding Castaneira's release plan, supervision agreement and addenda. Ligtenberg is also familiar with what transpired during the Parole Board meetings wherein Castaneira's supervision agreement was addressed. Ligtenberg's duties and responsibilities as Director are set forth under SDCL §§ 24-13-10 and 24-15A-13 and include, but are not limited to, assisting in the preparation of inmate supervision agreements, maintaining minutes and records of meetings, maintaining parole files, overseeing administrative functions, and performing other duties and activities as directed and authorized by the Secretary of the DOC and the Parole Board. As Director, Ligtenberg does not have the authority to grant, deny, rescind, or revoke parole, and these powers lie exclusively with the Parole Board.

Beginning on or about January 29, 1999, Castaneira began applying for discretionary parole release. South Dakota has two different frameworks for processing parole applications. The applicable framework is determined by the date of the inmate's criminal offense. Based on the offense date, an inmate falls under either the "old system" or the "new system." "Old system" inmates have no right to be paroled. In contrast, "new system" inmates have a right to parole release. Based on the date of Castaneira's criminal offense, his parole application fell under the "old system." This meant that Castaneira had no right to parole. Castaneira applied for parole several times between 1999 and 2001, and his applications were denied.

In June, 2002, Castaneira renewed his request for parole release. On June 28, 2002, the Parole Board voted to grant Castaneira's application for parole. The Parole Board's order granting parole was conditioned upon Castaneira signing a standard supervision agreement. Ligtenberg did not vote or make any recommendation regarding Castaneira's June 2002, parole application. The parole process consists of three general steps. First, there is the decision by the Parole Board to grant or deny parole. Second, if parole is granted, there is the completion of the supervision agreement. Finally, the release plan must be approved and finalized. Soon after an application for parole is granted, an initial target date is set for the inmate's release. The target release date is set so that paperwork and administrative tasks can be coordinated and completed. The target release date is not set by Ligtenberg or the Parole Board, and is instead set by the Regional Supervisor based upon the nature and scope of the administrative tasks that need to be completed prior to the inmate's release. Inmates are sometimes not released on their initial target release date. This can happen when the release plan is not approved or when the inmate's housing arrangements fall through. Inmates are also not released on their initial target release date when they delay in signing the supervision agreement. This is because there may not be enough time to complete all of the paperwork as a result of the delay. If an inmate continues to refuse to sign the supervision agreement, then they will not be released.

The paperwork that must be completed prior to an inmate's parole release is started by the case manager. The case manager is typically located at the institution where the inmate is housed. The case manager is notified which parole agent has been assigned to the inmate, and he or she then forwards the parole agent a copy of the inmate's release plan. The parole agent verifies that the release plan is workable and confirms that the inmate has arrangements made for housing and other basic necessities. During this time, the parole agent also prepares the supervision agreement under the supervision of the Director. If the parole agent or staff have any questions while preparing the supervision agreement, the Director is consulted.

Castaneira's initial target release date was set for August 12, 2002. Ligtenberg was not involved in setting Castaneira's target release date. Typically, an inmate will confer with his

institutional case manager several years before becoming eligible for parole in order to begin developing a release plan. The preparation of Castaneira's release plan was initiated well before his request for parole was granted in June, 2002. The release plan includes information such as where the inmate plans on living and vocational or educational plans following release. An inmate will meet periodically with his case manager while he is incarcerated in order to update and modify his release plan. When an inmate's parole application is granted, Parole Board staff promptly notifies the inmate and the inmate's institutional case manager. The Regional Supervisor then assigns a parole agent to the inmate. Castaneira was incarcerated at the Mike Durfee State Prison (MDSP) at the time his application for parole was granted. His case manager was James Halsey. John Schultz was assigned to be his parole agent.

All inmates must sign a supervision agreement before they are released. If an inmate refuses to sign a supervision agreement as offered, or attempts to negotiate the terms and conditions of release, the parole process cannot proceed. Pursuant to DOC and Parole Board regulations, policies, and practices, all supervision agreements are considered non-negotiable. The DOC and Parole Board do not negotiate with inmates regarding the terms and conditions of release. This is especially true with terms and conditions imposed by the sentencing court on an inmate's suspended sentence. The overall mission of the Parole Board and the Director is to carry out the orders of the sentencing court. The Parole Board does not physically prepare the supervision agreements. Instead, the supervision agreements are prepared by the Director and Parole Board staff at the direction of the Parole Board. As Director, Ligtenberg has supervised and participated in the preparation of supervision agreements. Ligtenberg was directed by the Parole Board to supervise the preparation of Castaneira's supervision agreement and provide any needed assistance. Castaneira had been told by Peterson in 2000 that his supervision agreement would include the terms and conditions that had been set by the sentencing court, and that if Castaneira were ever presented a supervision agreement, that this agreement must be signed as offered.

Ligtenberg supervised parole agent Shultz's preparation of Castaneira's supervision agreement. Schultz prepared and forwarded Castaneira's supervision agreement to Halsey so that

it could be signed by Castaneira and the parole process could continue. Inmates who are granted parole are presented supervision agreements well in advance of the target release date so that there is enough time to finalize the paperwork and close out the inmate's institutional account. For administrative reasons, the final release date is not set until the inmate signs the supervision agreement. When an inmate refuses to sign the supervision agreement, a final release date cannot be set. The final release date is typically set at least five days into the future in order to provide staff enough time to complete paperwork and finalize the release arrangements. While the final release date typically falls on or before the target release date, this is not always the case. Sometimes, the release date will be set later than the target release date depending upon the amount of time needed to finalize the paperwork and perform the necessary administrative tasks.

On or about July 30, 2002, Ligtenberg was notified by Parole Board staff that Castaneira had been presented his supervision agreement but had refused to sign the agreement as offered. Ligtenberg was told that Castaneira had instead signed an addendum to the supervision agreement, which he had prepared. Castaneira's addendum stated that it was his understanding the supervision agreement and no-contact provisions did not prohibit him from contacting Midland Insurance in connection with any legal proceedings. Castaneira further wrote that he did not believe he was subject to the conditions of his suspended sentence that had been imposed by the sentencing court. Ligtenberg had not been authorized by the Parole Board to render legal opinions regarding the effect of language contained in Castaneira's supervision agreement, nor had he been authorized or instructed to negotiate the terms and conditions of Castaneira's release. Ligtenberg told staff that Castaneira, like all other inmates, would need to sign the supervision agreement as offered. Halsey was instructed by Parole Board staff to tell Castaneira that the supervision agreement must be signed as offered for the parole process to continue.

On or about July 31, 2002, Ligtenberg was notified by Parole Board staff member Shelly Palsma (Palsma) that she had received a letter from Castaneira regarding the supervision agreement. Palsma provides administrative support for the Parole Board at the Mike Durfee State Prison, which was where Castaneira was housed at the time his application for parole was granted. Palsma

7

forwarded Ligtenberg a copy of Castaneira's letter. In this letter, Castaneira demanded to know why his parole release date had been cancelled and who had authorized such action.

On or about August 1, 2002, Ligtenberg received a telephone call from attorney Jeremiah Murphy (Murphy) regarding Castaneira's supervision agreement. Murphy told Ligtenberg that he was Castaneira's attorney, and he stated that Castaneira was concerned the no-contact provisions in the supervision agreement would impair his ability to pursue his lawsuit against Midland Insurance and engage in settlement negotiations. Murphy and Ligtenberg had more than one telephone conversation regarding Castaneira's supervision agreement. Prior to speaking with Murphy, Ligtenberg was not aware that Castaneira was actually involved in a lawsuit with Midland Insurance. Ligtenberg told Murphy that the no-contact provisions in the supervision agreement had been ordered by the sentencing court. Ligtenberg also told Murphy that nobody was trying to impede Castaneira's access to the courts, and that he did not foresee that the conditions imposed by the sentencing court would be enforced in such a manner. Inmates are encouraged to resolve their disputes through legal action rather than through the use of force or through other anti-social behavior. Murphy told Ligtenberg during at least one of their telephone conversations that Castaneira did not believe the Parole Board had the legal authority to impose any conditions on his parole or suspended sentence. Ligtenberg told Murphy that Castaneira, like all other inmates, must sign the supervision agreement as offered for the parole process to continue. Murphy accepted this, but nonetheless asked that modifications be made to Castaneira's supervision agreement. Ligtenberg said the agreement must be signed as offered. Murphy told Ligtenberg that Castaneira would sign the supervision agreement as offered.

There is a substantial amount of paperwork that must be completed whenever an inmate is released on parole. In Castaneira's case, certain administrative tasks were scheduled to be completed only after the supervision agreement had been signed. On or about August 1, 2002, Ligtenberg wrote to Castaneira that the terms and conditions of his supervision agreement were considered non-negotiable, and that the DOC would not be bound by Castaneira's understanding regarding the conditions of his release. Ligtenberg told Castaneira that he must sign the supervision agreement

8

without condition or qualification if he wished for the parole process to continue. Ligtenberg waited several days after writing to Castaneira, but he did not hear back from either Castaneira or Murphy regarding the supervision agreement, nor did Castaneira sign and return the supervision agreement that had originally been presented. Had Castaneira promptly signed and returned the supervision agreement as Ligtenberg had instructed in his August 1, 2002, letter, a final release date could have been set. It is possible, though not certain, that Castaneira's final release date would have fallen on or before the August 12, 2002, initial target release date.

Although Ligtenberg had been authorized by the Parole Board to consider and respond to Castaneira's objections to his supervision agreement, the Parole Board did not direct or authorize Ligtenberg to excuse Castaneira from complying with the general rule that a supervision agreement must be signed as offered. An inmate can ask to have the Parole Board consider his objections or requests for modification. Based upon Castaneira's and Murphy's objections to the supervision agreement, the requests for modification, and Castaneira's refusal to sign the supervision agreement as offered, Ligtenberg thought that the matter should be reviewed and considered by the Parole Board. Castaneira was notified that the Parole Board would be considering his objections and requests for modification and would determine how to proceed.

The Parole Board meets monthly. At the time Castaneira was told that the Parole Board would be considering his matter, the next regular-scheduled meeting of the Parole Board had been set for August 23, 2002. Castaneira's matter was considered at the August 23, 2002, Parole Board meeting.

On or about August 5, 2002, Ligtenberg wrote to the Parole Board regarding Castaneira. Because Castaneira had not signed the supervision agreement, a final release date had not been set. Whether a new initial target release date would be set depended upon how the Parole Board decided to proceed. Ligtenberg recommended that the Parole Board rescind Castaneira's parole based upon his attempt to negotiate the terms of his supervision agreement. Prior to the Parole Board's August 23, 2002, meeting, Ligtenberg forwarded copies of Castaneira's supervision agreement to all of the

Parole Board members. Ligtenberg also forwarded Castaneira's proposed addendum and copies of all correspondence, files, and documents. Ligtenberg told the Parole Board about Castaneira's and Murphy's objections to the supervision agreement, and these objections were also reflected in the materials that were forwarded.

Ligtenberg received a letter from Castaneira dated August 9, 2002, stating that he would sign the supervision agreement as it had originally been offered. At this time, however, Ligtenberg had already informed the Parole Board of Castaneira's objections and actions. At this point, it was for the Parole Board to decide how to proceed. Castaneira threatened that if he was not released on the August 12, 2002, initial release date, he would sue both Ligtenberg and the Parole Board. Castaneira also wrote that the Parole Board lacked the authority to incorporate into the supervision agreement the terms and conditions of release that had been imposed by the sentencing court. Ligtenberg forwarded a copy of Castaneira's letter to the Parole Board for its review prior to the August 23, 2002, meeting.

On August 22, 2002, Ligtenberg received a letter from Murphy directed to the Parole Board asking that Castaneira's parole not be rescinded. Ligtenberg forwarded Murphy's letter to the Parole Board for its review prior to the August 23, 2002, meeting. The Parole Board considered Castaneira's matter at its August 23, 2002, meeting. The Parole Board had before it at the meeting, and could consider, all of the relevant information and documents. The materials available to the Parole Board included, but were not limited to, Castaneira's supervision agreement and addendum and copies of all correspondence from Murphy and Castaneira. Castaneira believes that Ligtenberg failed to provide the Board with accurate and complete information. The Parole Board determined at its August 23, 2002, meeting that Castaneira had attempted to negotiate the terms of his community supervision agreement as it was presented and it rescinded Castaneira's parole.

On or before September 26, 2002, Castaneira filed an Application for Writ of Habeas Corpus in Minnehaha County Circuit Court challenging the recision of his parole. A hearing was held in the state court action on Castaneira's Application. Castaneira asserts that Judge Meierhenry orally

10

sustained the Writ, finding that the supervision agreement infringed on Castaneira's constitutional rights. Following this hearing, the Parole Board met to consider Castaneira's parole application. On November 21, 2002, the Parole Board voted to restore Castaneira's parole, and ordered that a new supervision agreement be prepared. The Parole Board directed that the supervision agreement should state that Castaneira may contact Midland Insurance and its employees in connection with his lawsuits or contract disputes so long as he notifies his parole officer in advance. Other than this change, the supervision agreement was virtually identical to the original supervision agreement that Castaneira had been presented but had refused to sign. Ligtenberg supervised the preparation of Castaneira's supervision agreement as directed by the Parole Board. Castaneira signed the supervision agreement and he was released on parole on December 5, 2002. Castaneira completed his parole on March 3, 2003, and immediately began serving the suspended portion of his sentence.

Sometime in late March or early April of 2003, Schultz told Ligtenberg that he had been contacted by Castaneira's brother, Ian Castaneira (Ian) and John L. Brady (Brady). Schultz said that Ian and Brady had heard Castaneira might be leaving South Dakota and returning to Maryland after he had completed his parole. Ian and Brady both lived in Maryland and told Schultz they did not want Castaneira to contact them if he returned to the area. Schultz told Ligtenberg that he intended to add Ian and Brady to Castaneira's no-contact list. Ligtenberg told Schultz to prepare an addendum to Castaneira's supervision agreement stating that he could not contact Ian and Brady. Ligtenberg told Schultz to make sure that this addendum specified that Castaneira and his attorney could still have contact with Ian or Brady within the context of any legal matters. Castaneira was presented, and signed, this addendum on or about March 11, 2003.

Ian's and Brady's requests were not unusual, as individuals often request that a parolee be restricted from contacting them. Parole agents attempt to accommodate such requests. An addendum is usually made to the parolee's supervision agreement prohibiting contacting with the individuals in question. This is done in order to protect the public and the parolee by helping him to avoid contacts that could escalate into a situation resulting in reincarceration.

11

On or about April 25, 2003, Ligtenberg appeared before the Parole Board to confirm that he was authorized to make necessary modifications to the terms of Castaneira's suspended sentence supervision agreement, and he also asked whether advance approval would be needed to make future changes. The Parole Board told Ligtenberg that he and parole agents were authorized to make changes to Castaneira's supervision agreement and that advance approval was not needed for future changes.

Ian contacted Schultz on or about April 28, 2003, asking that Castaneira also be prohibited from contacting Ian's wife, daughter, and immediate family members. Ian did not inform Schultz of any litigation pending between him and his brother, nor did he tell Schultz about any dispute he may have had with Castaneira over the handling of his mother's estate. Schultz contacted Ligtenberg in late April or early May, 2003, and said that Ian wanted Castaneira to also be prohibited from contacting Ian's wife, daughter, and immediate family members. Schultz told Ligtenberg that Ian had said his family was afraid of Castaneira and wanted no contact with him. Schultz said that he would prepare an addendum adding Ian's wife, daughter, and immediate family members to the no-contact list. Based upon what Schultz had told him, Ligtenberg agreed. The addendum prepared by Schultz stated that Castaneira and his attorney could still contact the specified individuals within the context of any legal proceedings or negotiations, but Castaneira believed that it unfairly limited his ability to do so.

On or about May 5, 2003, Schultz told Ligtenberg that Castaneira had refused to sign the addendum that added Ian's wife, daughter, and immediate family members to the no-contact list. On or about May 8, 2003, Ligtenberg received a letter from Castaneira objecting that the most recent addendum impeded his access to the courts. Castaneira also wrote that he did not believe the Parole Board could impose any conditions on his suspended sentence. Castaneira demanded proof that Ligtenberg possessed the authority to execute the addendum. Ligtenberg told several Parole Board members that Castaneira was refusing to sign the addendum and conveyed Castaneira's argument that the Parole Board lacked the authority to impose any conditions on his release.

On May 22, 2003, several Parole Board members expressed a desire to speak with Castaneira. Castaneira was called to appear before a limited panel of the Parole Board to explain exactly why he was refusing to sign the most recent addendum. Although these proceedings were informal, Murphy was contacted and allowed to participate in the meeting telephonically. At the May 22, 2003, meeting, which Ligtenberg attended, both Castaneira and Murphy argued to the Parole Board that conditions could not be placed on Castaneira's suspended-sentence release because none had been specified in the commutation order. The Parole Board members at the meeting told Murphy and Castaneira that it was the Parole Board's position it could impose conditions of supervision on Castaneira, and that if Castaneira refused to sign the second addendum, that he could be found in violation of the conditions of his release. The Parole Board told Murphy and Castaneira that the matter would be considered by the entire Parole Board the following day.

On May 23, 2003, the Parole Board met and considered Castaneira's objections to the addendum. The Parole Board voted that Castaneira would be required to sign the supervision agreement addendum as offered. At the conclusion of the Parole Board's meeting, a process server appeared and served Ligtenberg and the Parole Board with the Application for Writ of Prohibition that Castaneira had filed earlier that same day in state court.

In his state court Application for Writ of Prohibition, Castaneira argued that the Parole Board lacked the authority to impose any conditions on his suspended-sentence release. Castaneira also claimed that Ligtenberg had acted improperly by referring his objections and demands to the Parole Board. On May 27, 2003, a hearing was held before Minnehaha County Circuit Court Judge Kathleen Caldwell (Judge Caldwell) on Castaneira's Application for Writ of Prohibition. Attorney David Carter represented Ligtenberg and the Parole Board at this hearing. Carter reported to Ligtenberg following the hearing that Judge Caldwell had ruled that the addendum, which prohibited Castaneira from contacting certain individuals, could not be construed to prevent Castaneira from contacting the specified individuals in the course of any ongoing or future litigation.

13

The Parole Board met on June 4, 2003, and voted that Schultz and Carter should change the addendum to provide that Castaneira could contact the individuals in question provided that he obtained advance permission from the parole officer. The Parole Board directed that the addendum language should mirror the language contained in the supervision agreement addressing Castaneira's contacts with Midland Insurance and its employees.

On or about June 24, 2003, Castaneira filed this action against Ligtenberg and several individual members of the Parole Board alleging violations of his federal constitutional rights. As he did in the state court action, Castaneira alleged that Ligtenberg acted improperly by relaying his objections to the Parole Board. During this time, Schultz and Carter continued their efforts to craft an addendum that would be agreeable to Castaneira.

Schultz and Carter forwarded a revised addendum to Murphy and Castaneira. Murphy wrote to Carter on or about June 23, 2003, and suggested that the language addressing contacts with Ian and his family be broadened. Murphy also said that Castaneira continued to object to the imposition of any and all conditions on his suspended sentence.

On June 27, 2003, the Parole Board met to discuss Castaneira's continued objections to the revised addendum. The Board voted to have Carter and Ligtenberg contact Murphy and Castaneira and negotiate over the addendum language. Carter and Ligtenberg revised the addendum consistent with the suggestions set forth in Murphy's June 23, 2003, letter and forwarded the addendum to Murphy and Castaneira. Castaneira returned an addendum signed "under protest." This addendum, however, was different from the one that Carter and Ligtenberg had forwarded, and could not be accepted. At all times, Carter and Ligtenberg acted at the direction of the Parole Board and with its full knowledge and authorization.

On or about July 21, 2003, Ligtenberg filed an affidavit in Castaneira's state-court action indicating that negotiations over the addendum language had reached a standstill. Carter asked Judge Caldwell, in the state court lawsuit, for guidance regarding how the parties should proceed.

Castaneira prepared an addendum and, on July 30, 2003, Castaneira signed the addendum to the supervision agreement. This ended the dispute over the addendum and no-contact provisions. Castaneira, however, continued with his state court lawsuit and pursued his argument that the Parole Board lacked the legal authority to impose any conditions on his suspended sentence.

On or about July 31, 2003, Ligtenberg was served with a subpoena requiring his appearance before Judge Caldwell in a hearing to be held on August 5, 2003, at 3:30 p.m. Ligtenberg was directed to bring to this hearing any Parole Board files that would reflect inmates being granted a commutation on the condition that they not return to South Dakota following their release. Carter moved to quash the subpoena as improper. A hearing was held on August 5, 2003, on Castaneira's subpoena and the motion to quash. Ligtenberg appeared at the hearing and brought with him the specified documents. After hearing the arguments from the parties, Judge Caldwell issued a letter opinion denying Castaneira's Application for Writ of Prohibition. Judge Caldwell rejected Castaneira's claims, holding that the Parole Board possessed the authority to impose conditions on Castaneira's suspended-sentence release. Findings of Fact and Conclusions of Law were made and entered by Judge Caldwell on or about October 15, 2003. The factual findings made in *Castaneira v. South Dakota Board of Pardons and Paroles, et al.*, Civ. 03-1237 (2d Jud. Cir., Minnehaha County, S.D.) included, but were not limited to, the following:

    A.    "The Parole Board's supervision conditions upon Mr. Castaneira do not limit his access to the [c]ourts. The Board specifically informed Mr. Castaneira that if he chooses to engage in litigation with his family or others, that he could do so through the courts."

    B.    "Defendant Ligtenberg has not acted in this case in any improper manner independently from the Board of Pardons and Paroles in setting supervision conditions on Mr. Castaneira.

    C.    "The Board has complied with SDCL 24-15-27 in amending Castaneira's Supervision Agreement."

The conclusions of law entered in *Castaneira v. South Dakota Board of Pardons and Paroles, et al.*, Civ. 03-1237, (2d Jud. Cir., Minnehaha County, S.D.) included, but were not limited to, the following:

15

A. That the conditions imposed by the Parole Board and Ligtenberg were constitutional and did not violate Castaneira's right to due process.

B. That the Parole Board complied with SDCL § 24-15-27 in amending Castaneira's supervision agreement.

C. That individuals on parole or suspended sentence do not enjoy the same unrestricted rights as citizens in general.

D. That the Parole Board has a legitimate penological interest in restricting a parolee's ability to contact certain individuals while on supervised release.

E. That the Parole Board possessed the authority to impose conditions on Castaneira's parole and suspended sentence above and beyond those set forth in the commutation order.

F. That the supervision conditions imposed on Castaneira did not violate any of his federal constitutional rights.

G. That the Parole Board acted within its jurisdiction in imposing conditions on Castaneira's release.

H. That Castaneira's claims and arguments were devoid of merit.

In his Amended Application for Writ of Prohibition filed on or about May 27, 2003, in *Castaneira v. South Dakota Board of Pardons and Paroles, et al.,* Civ. 03-1237 (2d Jud. Cir., Minnehaha County, S.D.), Castaneira had alleged that Ligtenberg failed to respond to his May 8, 2003, letter and acted improperly by referring Castaneira's objections and complaints to the Parole Board, that he engaged in "retaliatory" action, and that he imposed conditions on his release independently from the Parole Board. Judge Caldwell rejected Castaneira's arguments, finding that Ligtenberg did not act improperly or independently from the Parole Board and concluding that no due process violation, or any violation of state or federal law, had been shown. Castaneira's appeal of Judge Caldwell's findings and conclusions was dismissed by the South Dakota Supreme Court on April 5, 2004.

## DISCUSSION

The parties agree that parole board members are absolutely immune from suit for considering and deciding parole questions, whether the decision is based on lawful or unlawful considerations.

*See Patterson v. Von Riesen*, 999 F.2d 1235, 1239 (8th Cir. 1993). Ligtenberg is not a member of the Board; he is the Executive Director. Statutes provide that Ligtenberg is responsible for overseeing the preparation of inmate supervision agreements, maintaining minutes and records of meetings, maintaining parole files, and overseeing administrative functions. SDCL §§ 24-13-10 and 24-15A-13. The law also provides that Ligtenberg is to "[p]erform such other duties as the board and the secretary may prescribe." SDCL § 24-13-10. Ligtenberg agrees that he has no authority to deny, rescind or revoke parole. Defendant argues that the Parole Board's absolute immunity extends to him because his actions involving Castaneira, like those of the Parole Board, were quasi-judicial in nature. Castaneira recognizes that some of Ligtenberg's activities involved using discretion and independent decision making, but he argues that Ligtenberg was mainly a "conduit for information passing between the Plaintiff and the Board," (doc. 34, p. 10), and he disagrees that Ligtenberg's functions were quasi-judicial in nature. In regard to the sole remaining claim in this case, the retaliation claim against Ligtenberg, the parties focus on Ligtenberg's actions in preparing Castaneira's initial supervision agreement, in reporting to the Parole Board that Castaneira had attempted to negotiate the terms and conditions of his release,[1] and in requiring Castaneira to sign an addendum to the supervision agreement that broadened its no-contact provisions.

For the most part, the parties agree on the law of absolute quasi-judicial immunity. The Supreme Court has emphasized that the nature of the function being performed, not the particular act itself, controls the absolute immunity inquiry. *See Mireles v. Waco*, 502 U.S. 9, 12-13 (1991). Castaneira admits that absolute immunity has been given to individuals involved in making recommendations to the parole decision-makers. For example, in *Anton v. Getty*, 78 F.3d 393 (8th Cir. 1996), a federal parolee brought a *Bivens* action that included probation officers as defendants. The parolee contended that the probation officers violated his constitutional rights by "concluding

---

[1]This is the heart of Castaneira's retaliation claim. According to the Amended Complaint, Castaneira wrote to Ligtenberg on or about August 9, 2002 and stated that he would sign the parole agreement as it had been offered and then would refer the matter to the courts (Doc. 7, Amended Complaint at ¶ 80.) Castaneira alleges that Ligtenberg responded to the letter by falsely reporting to the Parole Board that he was attempting to negotiate the terms of his release and by recommending that Castaneira's release be rescinded. (Doc. 7 at ¶¶ 79-84.)

17

that his release plan was unacceptable and recommending that his parole be delayed." *Id.* at 396. The Eighth Circuit found that the information and recommendations provided by the probation officers to the parole hearing examiners played a significant part in the parole decision making process. *See id.* The Eighth Circuit concluded that probation officers are entitled to absolute immunity when they "perform discretionary tasks that play an integral part in the decision making process," such as when they "evaluate facts, draw legal conclusions, and make recommendations." *Id.* at 396. In reaching this conclusion, the Eighth Circuit distinguished *Ray v. Pickett*, 734 F.2d 370 (8th Cir.1984). *See Anton*, 78 F.3d at 396 n.5. In *Ray,* the Eighth Circuit held that a probation officer was only entitled to qualified immunity for the role he played in the parole revocation process because the officer's function was not "so intimately associated with the judicial process that it entitle[d] [him] to an absolute immunity." *Ray*, 734 F.2d at 373. The officer in *Ray* filed a parole-violation report which merely triggered an inquiry by another officer that may or may not have led to an administrative proceeding. *See id.* In contrast, the duties of the probation officers in *Anton* were "closely connected to Parole Commissioner Getty's decision to delay Anton's parole." *Anton*, 78 F.3d at 366 n.5.

Castaneira attempts to distinguish *Anton* by arguing that Ligtenberg was uninvolved with the Parole Board's decision making process because the Parole Board members made their decisions independent from Ligtenberg's recommendations. But that is not the test. As stated above, according to the Eighth Circuit, this Court is to determine whether Ligtenberg's function played an integral part in the decision making process, or whether his function was intimately associated with the process. Ligtenberg met with Castaneira, talked with Castaneira's attorney, evaluated the facts surrounding Castaneira's parole, drew the conclusion that Castaneira was inappropriately trying to negotiate the terms of his parole, and made reports and recommendations to the Parole Board. In addition, Ligtenberg was given express authority to make discretionary determinations about modifications to Castaneira's suspended sentence supervision agreement without advance approval from the Parole Board. These actions were not simply administrative activities, and they were done in the context of, and integrally associated with, an ongoing Parole Board decision to grant or rescind Castaneira's release on parole. In the present case, it is apparent that Ligtenberg played an essential

part in the Parole Board's decision making process, even more so than the probation officer who was granted absolute immunity in *Anton*. Thus, Ligtenberg should be accorded the same protection that was accorded the Parole Board members in this case, and the Court finds that Ligtenberg is entitled to absolute immunity under the unique circumstances involved here.

Ligtenberg supplemented the record with a recent Eighth Circuit decision in *Figg v. Russell*, 433 F.3d 593 (8th Cir. 2006). The *Figg* Court noted that when a parole agent's function is "so associated" with the quasi-judicial function of the Parole Board the agent is cloaked in absolute immunity, at least for purposes of that function. *Id.* at 599-600. In *Figg*, the parole agent was afforded absolute immunity for his role in offering Figg a parole/suspended sentence agreement because he was acting as a representative of the Parole Board. *See id.* This Court reads *Figg* to broaden the scope of absolute immunity available to parole personnel and surely encompasses Ligtenberg's acts in the present case.

The allegation that Ligtenberg acted the way he did for an improper purpose such as retaliation does not deprive him of immunity. *See, e.g., Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("[I]mmunity applies even when the judge is accused of acting maliciously and corruptly."); *Martin v. Hendren*, 127 F.3d 720 (8th Cir. 1997) (police officer who removed woman from courtroom with excessive force was acting as a *de facto* bailiff, obeying a judicial command, and was entitled to absolute quasi-judicial immunity despite use of excessive force). In *Barr v. Abrams*, 810 F.2d 358 (2d Cir. 1987), the Second Circuit upheld a defense of absolute immunity against a section 1983 claim that the prosecutor commenced and continued a prosecution for purposes of retaliation. In addition, the Supreme Court has indicated that a prosecutor is entitled to absolute immunity despite allegations of his "knowing use of perjured testimony" and the "deliberate withholding of exculpatory information." *Imbler v. Pachtman*, 424 U.S. 409, 431 n. 34 (1976) (recognizing that prosecutorial misconduct may be subject to professional or even criminal sanctions at the same time that it fits within the scope of duties as an advocate, which are entitled to absolute immunity from suit for money damages). Although such conduct would be "reprehensible," it does not make the prosecutor amenable to a civil suit for damages. *Id.*

19

For all of these reasons, the Court concludes that Ligtenberg is entitled to absolute immunity for his role in Castaneira's parole proceedings. In light of this ruling, the Court will not address the issue of qualified immunity.

The *pro se* Amended Complaint may also be construed as including a request to enjoin Ligtenberg from future retaliation against Castaneira. (Doc. 7, Amended Complaint ¶¶ 6 and 9 of the prayer for relief.) Absolute immunity from a claim for damages does not bar granting injunctive relief. *See, e.g., Pulliam v. Allen*, 466 U.S. 522, 536-37 (1984). Ligtenberg addressed dismissal of the claim for injunctive relief in his Reply Brief (doc. 38), but Castaneira had no opportunity to respond to the arguments raised in that brief. Thus, the motion for summary judgment will be granted to the extent that it was directed to Castaneira's claim for damages. Ligtenberg is not precluded from filing a motion on Castaneira's claim for injunctive relief. Accordingly,

IT IS ORDERED that the Motion for Summary Judgment, doc. 26, is granted as to Plaintiff's claim for damages against defendant Ligtenberg.

Dated this 7th day of March, 2006.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
            DEPUTY

20